AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, COUNCIL 33; American Federation of Government Employees, AFL–CIO, L–3584; and Benita Mays, Plaintiffs,

v.

Edwin MEESE, III, Attorney General of the United States; J. Michael Quinlan, Director, Bureau of Prisons; and Rob Roberts, Warden, Pleasanton Federal Correctional Institution, Defendants.

No. C–88–1419 SAW.

United States District Court,
N.D. California.

June 16, 1988.

---

Cliff Palefsky, McGuinn, Hillsman & Palefsky, San Francisco, Cal., Mark D. Roth, Gen. Counsel, Joe Goldberg, Staff Counsel, American Federation of Government Employees, Washington, D.C., for plaintiffs.

Joseph P. Russoniello, U.S. Atty., Judith A. Whetstine, Chief, Civil Div., George Christopher Stoll, San Francisco, Cal., John R. Bolton, Asst. Atty. Gen., Mary E. Goetten, Richard G. Lepley, Attorneys, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING PRELIMINARY INJUNCTION

WEIGEL, District Judge.

### I. Summary of Decision

On January 25, 1988, the Federal Bureau of Prisons of the United States Department of Justice (the Bureau) adopted its "Federal Bureau of Prisons Drug–Free Workplace Program" (the Program). The Program would force law abiding employees of the Bureau, on two hours telephone notice, to submit to urinalysis testing even though not suspected of any drug use nor of any wrongdoing, negligence or dereliction of duty. Plaintiffs challenge the constitutionality of such testing, asserting that it violates Bureau employees' Fourth Amendment right to be free from unreasonable search.

The Bureau's proffered justifications for implementation of mass urinalysis testing are not supported by objective evidence. Therefore, the compulsory testing violates plaintiffs' constitutional rights under the Fourth Amendment, to be "secure in their persons ... against unreasonable searches." While the Court recognizes the serious problem of drug abuse facing our nation, the means of combatting it must be lawful.

There are cases in which compulsory drug testing may be justified in the interest of public safety or security or the like. This is not one. Rights guaranteed by the Constitution of the United States must not bend to public clamor. Unless and until the Bureau of Prisons may be able to present solid evidence that mandatory drug testing of innocent employees is required to insure the effective performance of duty by all or any class of its employees, the compulsory testing provisions of the Program must yield to the constitutional rights of law abiding employees.

The preliminary injunction granted by this Court is carefully limited to protect those rights.

### II. Prefatory Note

This memorandum constitutes the Court's findings of fact and conclusions of law. The findings are based on the record; the conclusions upon the relevant law.

### III. The Facts

On September 15, 1986, President Reagan issued Executive Order 12564, 51 Fed. Reg. 32,889–32,893 (Sept. 17, 1986), mandating that all executive agencies of the federal government establish programs "to test for the use of illegal drugs by employees in sensitive positions." *Id.* at § 3(a). The details of such programs were left largely to the discretion of agency heads.

On September 25, 1987, pursuant to the Executive Order, the Department of Justice (DoJ) promulgated its "Drug–Free Workplace Plan". On January 25, 1988, as authorized by that Plan, the Bureau undertook to put into effect the Program involved in this case.

The Program calls for mandatory random testing of all employees, including administrators, secretaries and other office workers.[1] Probationary employees (those in their first year of Bureau employment) and management employees (those ranked at or above grade GM–13) would be subject to extra testing. In addition to remaining subject to the general random testing, each probationary employee would be tested once during the probationary period, and each management employee would be tested annually.[2]

The employees required to be tested would be chosen at random by computer. Those so selected would be required, on telephone notice as little as two hours, to report to a designated location for collection of a urine specimen. There, an escort of the same sex as the tested employee would be present to insure against alteration of the specimen. If there were reason to believe that a particular individual might alter the specimen, the escort would visually observe the urination.

Refusing to provide a specimen would result in disciplinary action up to and including discharge.

Laboratory testing of the urine would be conducted in accordance with technical guidelines promulgated by the Department of Health and Human Services (HHS

Guidelines). 53 Fed.Reg. 11970 (April 11, 1988). The possible disciplinary consequences of a positive test result,[3] while dependent on the circumstances of each case, would include discharge.

Plaintiff Benita Mays, a secretary with the Bureau at the Federal Correctional Institution in Pleasanton, California, would be subject to random testing under the Program. Plaintiff American Federation of Government Employees (AFGE), AFL–CIO, Council 33, is the bargaining representative for Bureau employees nationwide. Plaintiff AFGE, AFL–CIO, L–3584 is a chartered local of AFGE which represents Bureau employees in Northern California.

Defendant Edwin Meese, III is the Attorney General of the United States. Defendant J. Michael Quinlan is Director of the Bureau. Defendant Rob Roberts is the warden of the Pleasanton Federal Correctional Institution.

Testing under the Program was scheduled to begin May 23, 1988. On May 20, 1988, this Court granted plaintiffs' application for a restraining order, temporarily enjoining implementation of the Program pending decision on plaintiffs' motion for preliminary injunction.[4] That motion is now before the Court.

### IV. Requirements for Preliminary Injunctive Relief

█ The standards governing decision as to issuance of a preliminary injunction are well settled. This Court must consider plaintiffs' likelihood of success on the mer-

---

**1.** The Director of the Bureau decided that all positions, clerical or otherwise, are "sensitive" under the Executive Order and therefore that all employees are subject to random testing. Approximately five to ten percent of employees would be tested each year. Federal Bureau of Prisons Drug–Free Workplace Program Statement, January 25, 1988, at 14.

**2.** The Program also provides for testing of job applicants, testing in connection with on-the-job accidents or unsafe activities, and testing if reasonable suspicion exists that "an employee is under the influence of or using drugs." Program Statement at 12.

**3.** The first test, an FDA–approved immunoassay test, if positive, is to be confirmed by a gas chromatography/mass spectrometry assay, a more reliable testing method. An employee whose test is confirmed positive is given the opportunity to justify that result before a medical review officer, who may conclude, for example, that the positive result was due to prescription medication.

**4.** The temporary restraining order does not preclude testing based on reasonable suspicion nor testing of applicants for employment. By consent of the parties, the temporary restraining order was extended to and including June 16, 1988.

its and the possible harm to the parties from granting or denying the preliminary injunction. "The critical element . . . is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984) (citation omitted). As to this balancing: Preliminary injunctive relief is appropriate if the moving party demonstrates probable success on the merits and the possibility of irreparable harm or if the moving party shows that serious questions are raised—i.e., a "fair" chance of success on the merits—and that the balance of hardships tips sharply in favor of the moving party. *Id.* The balancing of these factors rests in the reasonable discretion of the trial court. *Id.* On the facts of this case, as will be clear from what follows, the plaintiffs are entitled to a preliminary injunction.

### V. Concerning the Fourth Amendment

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches . . ." There are literally scores of cases throughout the United States which attempt to reconcile the Fourth Amendment's constraints upon the government with attempts by the government to impose involuntary urinalysis testing such as that here involved. A relevant sampling includes: *Railway Labor Executives Ass'n v. Burnley,* 839 F.2d 575 (9th Cir.1988) (prohibiting compulsory blood and urine tests of railroad employees after certain train accidents, fatal incidents, and rule violations, absent reasonable individualized suspicion of current impairment); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1987) (upholding urinalysis testing of Customs Service employees voluntarily seeking transfer to sensitive positions, when specimen collection is scheduled in advance and there is no visual observation of urination process); *McDonnell v. Hunter,* 809 F.2d 1302 (8th Cir.1987)

(random urinalysis testing of correctional institution employees constitutional if limited to those having day-to-day contact with prisoners in medium or maximum security prisons, since those employees have diminished expectation of privacy, and government has legitimate interest in insuring security of prisons); *Penny v. Kennedy,* 846 F.2d 1563, (6th Cir.1988) (mass urinalysis testing of police officers unconstitutional since potential harm from impaired officer is neither catastrophic nor irretrievable, and there was no evidence of any significant drug problem among officers); *Shoemaker v. Handel,* 795 F.2d 1136 (3rd Cir. 1986) (random urinalysis testing of race horse jockeys constitutional since pervasive regulation of horse racing industry, including licensing of jockeys and other employees, reduces jockeys' expectations of privacy and state has legitimate interest in maintaining public integrity of horse racing); *National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416 (D.D.C.1988) (mass urinalysis testing of civilian Army employees unconstitutional since excessively intrusive and not reasonably related to government's safety, security, or integrity concerns); *Capua v. City of Plainfield,* 643 F.Supp. 1507 (D.N.J.1986) (mass urinalysis testing of city fire fighters unconstitutional since highly intrusive and city had neither general job-related basis for instituting testing nor any individualized suspicion that any employee was impaired by drugs).

In each of these cases, the determination as to constitutionality is based almost entirely upon consideration of the particular facts to answer this question: Does a proper governmental interest justify the intrusiveness of the compulsory testing program? The facts in the case before this Court require the conclusion that the Bureau's random compulsory testing is not justified.

### A. Fourth Amendment Search

It is well settled that urinalysis testing of employees constitutes a search within the meaning of the Fourth Amendment, because it violates employees' reasonable

expectation of privacy. *E.g., Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.1988); *National Federation of Federal Employees v. Weinberger,* 818 F.2d 935 (D.C.Cir 1987); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1987).

There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.

*Von Raab,* 816 F.2d at 175.

Not only is urination traditionally a private bodily function, but the information contained in urine also comes within employees' reasonable privacy expectations. *Burnley* at 580. "One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds." *McDonnell v. Hunter,* 612 F.Supp. 1122, 1127 (D.Iowa 1985), *affirmed as modified,* 809 F.2d 1302 (8th Cir.1987).

Since urinalysis testing constitutes a Fourth Amendment search, the Court must determine whether the search is reasonable. That determination depends on the context in which the search occurs. *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). The Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *O'Connor v. Ortega,* — U.S. —, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987) (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). The government asserts three interests which justify the random testing: safety, prevention of corruption, and the maintaining of public confidence in the Bureau.

**B. The Nature and Quality of the Intrusion**

Courts have found urinalysis testing highly intrusive, comparing it to body cavity searches, *Burnley,* 839 F.2d at 586, citing *Tucker v. Dickey,* 613 F.Supp. 1124 (W.D.Wis.1985) (urinalysis testing as degrading as body cavity search), and insisting on careful scrutiny when urinalysis is to be used. *Storms v. Coughlin,* 600 F.Supp. 1214, 1219–1220 (S.D.N.Y.1984). Moreover, when viewed in light of employees' legitimate privacy expectations discussed above, both the specimen collection process and the subsequent laboratory analysis are definitely intrusive.

Under the Program here before the Court, the employee could be summoned while at work, required upon short notice to report to a designated collection site and there, in the presence of an escort, required to produce a urine specimen of not less than 60 milliliters. Designated collection sites are to provide a stall or partitioned area for "individual privacy", but actual observation of the employee discharging into a container may also be required, if the escort has reason to believe that the specimen might be altered. HHS Guidelines also require that various measures be taken to prevent specimen tampering. Toilet tanks at collection sites must contain bluing agents so that the toilet water will always be blue. "There shall be no other source of water ... in the enclosure where urination occurs." 53 Fed.Reg. at 11980. Before urinating, the employee is required to produce photo identification and to discard all unnecessary outer garments as well as purses, briefcases, and other personal belongings. Collection site personnel are charged with recording any "unusual behavior or appearance" by the tested employee. *Id.* at 11981. Immediately after the specimen is produced, it is checked for temperature,[5] color, and any other signs of alteration or contamination.

---

**5.** If the temperature of a specimen falls outside the range of 90.5°–99.8°F., the employee must provide a second sample under the escort's direct visual observation. The employee may volunteer to have an oral temperature taken, in order to counter the presumption that the specimen was altered. 53 Fed.Reg. at 11981.

All Bureau employees, including administrators, correctional officers, and clerical staff, would be subject to this elaborate procedure. Not only is specimen production upon demand inherently intrusive, but this procedure which treats innocent employees as suspects magnifies the intrusion. Being tapped during the work day and ordered to urinate into a container while under the close surveillance of a government representative, "regardless of how professionally or courteously conducted, is likely to be a very embarrassing and humiliating experience." *Capua,* 643 F.Supp. at 1514.[6]

Laboratory analysis of an individual's urine is also highly intrusive. The information which laboratory analysis may reveal is very personal and justifies high expectations of privacy. Laboratory analysis may reveal, for example, whether an individual suffers from diabetes, or whether an individual is taking medication for epilepsy or depression, or whether a female is pregnant. The government does not propose to test for anything other than illegal drugs, but HHS Guidelines allow the specimens to be used for any other analysis "authorized by law." 53 Fed.Reg. at 11980.

Even testing limited to detection of illicit drug use would reveal legal use of prescription medication. Moreover, urinalysis does not demonstrate current impairment. It discloses no more than "recent" ingestion of drugs. "Recent" may range from hours before the test to weeks before it. The testing program therefore enables government surveillance of employees' private, off-duty lives. This type of chemical surveillance represents a serious intrusion.

"[S]uch tests may provide Government officials with a periscope through which they can peer into an individual's behavior in her private life, even in her own home." *Jones v. McKenzie,* 833 F.2d 335, 339 (D.C.Cir. 1987).

### C. The Governmental Interests Claimed by the Bureau

As before indicated, defendants claim that the Program promotes three governmental interests: safety, prevention of corruption, and preservation of the public's confidence in the Bureau. The Court now proceeds to evaluate those claimed interests in light of the facts.

### D. Balancing the Intrusiveness of the Search Against the Claimed Governmental Interests

■ In order to be reasonable, the search must meet two requirements. First, it must be justified at inception. Second, as actually carried out, it must be reasonably related in scope to the circumstances justifying the search in the first place. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742. Because the Court finds the Bureau's random testing not justified at its inception, the question as to scope need not be reached.

The government seeks to make each and every one of the Bureau's 13,000 employees subject to random testing, regardless of job function. Of the numerous decisions by federal courts concerning Fourth Amendment challenges to mandatory urinalysis testing, *none* upholds a testing program as sweeping as that here at issue.[7]

---

6. While the Bureau employees were given sixty days notice that random testing was to begin, this general notice cannot diminish their privacy expectations. Indeed, the government argues that the effectiveness of random testing *depends* on the element of surprise. "The whole purpose of random testing is to ... test people without them knowing it's coming." Transcript of Proceedings, May 26, 1988, at 38.

7. *Von Raab* upheld one-time testing for Customs Service employees voluntarily seeking to transfer to sensitive positions. Specimen collection was scheduled in advance, and there was no visual observation of the urination process.

The testing in *Shoemaker* was limited only to race horse jockeys, who were already under pervasive regulation by the New Jersey Racing Commission. In *Rushton v. Nebraska Public Power District,* 844 F.2d 562 (8th Cir.1988), random urinalysis testing was upheld for employees with access to protected areas within a nuclear power plant, who had diminished expectations of privacy because the industry is heavily regulated, access to the plant is carefully controlled, and people inside the plant are subject to observation. In *McDonnell,* random urinalysis of correctional institution employees was limited to those having day-to-day contact with prison inmates in medium or maximum securi-

The government bears a heavy burden in attempting to justify at its inception mass urinalysis testing of employees as to whom there is no reasonable suspicion of drug use. "Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal ..." *T.L.O.* at 342 n. 8, 105 S.Ct. at 743 n. 8. The intrusiveness of urinalysis testing is far from minimal.[8] Its potential as a device for pervasive government surveillance into the private affairs of Bureau employees demands that only serious and weighty governmental interests qualify as adequate justification. For urinalysis testing, "[o]nly a compelling need of the government as employer could justify dispensing with the requirement of individualized suspicion." *National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416, 431 (D.D.C.1988).

In *Burnley,* the Ninth Circuit held that compulsory blood and urine testing of employees requires reasonable individualized suspicion of drug use, even though the testing was to be done only after serious train accidents, fatal incidents, or serious rule violations. Examination of the government's alleged interests here in this case cannot justify adopting a lower standard of suspicion.

As to the safety concern, the government has not shown that interest to be compelling. Especially as to employees who do not work within correctional institutions, the safety concern is a weak one. The

clerical worker in the Bureau's Washington, D.C. headquarters would hardly pose a safety threat should that employee report for work while under the influence of illegal drugs. While this Court recognizes that there are other Bureau employees—for example, armed correctional officers within institutions—who might pose a significant safety hazard to themselves and others if drug-impaired while on duty, *the Bureau has presented no evidence indicating that such drug-related safety problems exist or have existed. The record contains not one instance of any safety problem resulting from employee drug use. Nor has the government shown any reason to anticipate that such problems are imminent.* [9]

In addition, the government concedes that urinalysis testing cannot demonstrate current impairment. Transcript of Proceedings, May 26, 1988, at 48. So even if there were reason to anticipate safety hazards as a result of on-duty impairment of Bureau employees, a positive test result would not show that impairment. There is no meaningful link, then, between the proposed testing and the government's alleged safety concern. *See Burnley* at 588 (blood and urine tests to detect drug use "are not reasonably related to the stated [safety] purpose of the tests because the tests cannot measure current drug intoxication or degree of impairment."). On that rationale, the government has failed to justify the testing.

---

ty prisons. Also noteworthy in *McDonnell* is the fact that while the district court's final order permanently enjoining all testing was modified on appeal to allow limited testing, that final order was preceded by the district court's issuance of a preliminary injunction, which the Court of Appeals affirmed. *McDonnell v. Hunter,* 746 F.2d 785 (8th Cir.1984).

**8.** The government suggests that Bureau employees within correctional institutions have diminished expectations of privacy, because at some entrances to some institutions signs are displayed which warn of the possibility of "urine surveillance" if the warden has reasonable suspicion that a person is introducing contraband. Quinlan Declaration at 4.

The leap from reasonable suspicion testing to random testing based on *no* suspicion is a great

one. While certain Bureau employees within correctional institutions may have lower privacy expectations than non-institutional employees, *see McDonnell,* 809 F.2d at 1306, the compulsory surrender of bodily fluids for government analysis, based on no suspicion whatsoever, is a very significant intrusion. *See Burnley,* 839 F.2d at 586.

**9.** This dearth of evidence is hardly surprising, as the Bureau's Program was not instituted in response to any particular past or anticipated safety problems within the Bureau. It was required in order to comply with Executive Order 12564, in which the President articulated general society-wide problems associated with illegal drug use and mandated drug testing within the Executive Branch. See Program Statement at 2–4.

As another justification for the mass random testing, the government asserts its interest in fighting corruption within the Bureau. The Bureau contends that drug using employees are susceptible to blackmail and might be forced to divulge confidential information, such as the identities and locations of persons protected under the government's witness protection program. *Again, the Bureau fails to present any evidence that this perceived danger is anything but speculative. It has produced not one articulable fact upon which to base the claimed apprehension.*

The Bureau does list thirteen instances in 1987 in which employees were involved in bringing drugs into institutions. Howver, there is no evidence that the offending employees were drug users. There is nothing more than a vague averment that "[t]here was evidence that some of the staff members involved were using drugs, which we believe made them more susceptible to corruption." Quinlan Declaration at 6. Nowhere is there even a hint at what this evidence of drug use might have been. Nor does the affiant suggest the basis for the belief that the purported drug use made employees corruptible. *Cf. Berry v. District of Columbia,* 833 F.2d 1031, 1035 (D.C.Cir.1987) (trial court cannot uncritically accept, without reliable evidence, government's assumption that drug use by arrestee makes it more likely that arrestee released on bail will commit crimes or fail to appear for scheduled court dates).

Moreover, there may be less intrusive measures available to deter introduction of drugs by institutional employees, such as random searches of employees' personal belongings. This Court makes no finding as to the constitutionality of such measures. It merely points out that there are less intrusive measures which may be undertaken. *See Von Raab,* 816 F.2d at 180 (courts should consider availability of less intrusive measures in determining reasonableness of particular search).

The government's public integrity rationale is the weakest. The rationale is speculative and is based upon the assumption that if the public were to believe that there might be drug use among Bureau employees, the Bureau might have some public relations problems. Such "image" concerns are hardly compelling interests justifying random compulsory testing. The Bureau does not offer any concrete consequences which might result from a bad public image.

### VI. Conclusion

By insisting upon hard evidence to support the Bureau's claim that the dangers are real and not speculative,[10] the Court does not suggest that the government must always wait for an anticipated harm to occur before deterrent measures are justified. However, when the government adopts a comprehensive program of deterrence which has as its centerpiece an intrusive search of the bodily fluids of law abiding citizens, randomly selected and as to whom the government has absolutely no basis for suspecting wrongdoing of any kind, there must be at least some showing that the search is necessary.

If the government presents objective evidence that its concerns are real—that anticipated harms are more than speculative—and that random urinalysis testing reasonably addresses those concerns, it may move for modification of this injunction. It may do so if incidents hereafter show drug use to have resulted in impairment of duty or danger of any kind.

It must be remembered that what is sought to be deterred by the Program is not general drug use, but drug use as it affects work performance. The Bureau in this case is an employer, not a law enforcer. The government may certainly take an interest in deterring drug use throughout society, but that interest cannot justify random testing. Otherwise, mass testing of the entire population of the nation would be justified. And that would be the beginning of a police state prohibited by the

---

**10.** Because the Bureau has failed to articulate any compelling or even significant interest justifying mass random urinalysis testing, the Court need not address the government's contention that random testing of Bureau employees could be justified as an administrative search.

Constitution. The government, the nation's largest employer, may not hide behind that role in attempting to justify intrusive searches of innocent citizens who happen to be in its employ, absent some compelling, articulable interest of the government *qua* employer. *See National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 943 n. 12 (D.C.Cir. 1987).

The Court recognizes the society-wide problem of drug use and that urgent measures are required in response. But such measures must be lawful; they must not violate the Constitution. "Only with the greatest caution should we whittle away basic constitutional rights, for we often come to regret the unfortunate rulings we have made in times of hysteria in the past." *McDonnell*, 809 F.2d at 1310 (Lay, C.J., dissenting).

A fundamental tenet of our system of justice is that a defendant charged with crime enjoys a presumption of innocence. Surely law abiding citizens, not so charged, deserve as much. The Bureau's drug testing program casts too wide a net—it ensnares law abiding employees not even suspected of drug use.

While at times the costs of living in a free society—for example, that some criminals may go free or that some drug users are not apprehended—may seem high, we must not lose sight of nor take for granted the individual rights guaranteed by our constitutional form of government. To compromise these rights in times of controversy or public passion is to forsake them. This we must not do.

■ Because the government has failed to show any justifiable basis for instituting the mass urinalysis testing, the Court finds that plaintiffs will probably succeed on the merits of their Fourth Amendment challenge to random testing.[11] As to the balancing of hardships, it is clear that failure to issue a preliminary injunction would subject innocent, law abiding, and wholly competent Bureau employees to unjustified urinalysis testing. On the other hand, the government fails to show any harm in enjoining the random testing pending a full-scale trial in this factually complex case. A preliminary injunction is therefore appropriate.[12]

Accordingly, IT IS HEREBY ORDERED that:

**11.** In addition to challenging random testing, plaintiffs argue that the Program's provision for urinalysis testing in connection with on-the-job accidents or unsafe activities also violates the Fourth Amendment, since urinalysis may be demanded without any suspicion that drug use had anything to do with the unsafe activity. *Burnley* controls. The accident testing enjoined in that case, which did not require reasonable individualized suspicion of drug use, was more narrowly tailored than in this case, requiring urinalysis only for certain specifically enumerated serious accidents, fatal incidents, and rule violations. The Bureau's accident testing provides no such limitations; the "Chief Executive Officer at the appropriate level" is given unbridled discretion to determine whether an "accident" has occurred and whether urinalysis is required. See Program Statement at 12. The government interest at stake in *Burnley*—the safety of the railroads—is at least as significant as in the case *sub judice*. Under *Burnley*, the Bureau's accident or unsafe practice testing must also be enjoined.

**12.** Defendants urge this Court to stay the effect of its injunction pending appeal. The requirements for granting a stay pursuant to Fed.R. Civ.P. 62(c) are that (1) the applicant make a

strong showing that he is likely to succeed on the merits of the appeal; (2) the applicant establish that unless a stay is granted he will suffer irreparable injury; (3) no substantial harm will come to other interested parties, and (4) a stay would do no harm to the public interest. Wright & Miller, *Federal Practice and Procedure*, Civil § 2904. The Court's previous discussion makes clear that defendants do not satisfy *any* of the four requirements for a stay. Moreover, granting of a stay would effectively nullify the preliminary injunction. It would make no sense for this Court to decide that a preliminary injunction is appropriate and then deny that injunction any effect. Plaintiffs are entitled to the maintenance of the *status quo* pending completion of trial or appeal.

The Court has noted assertions by counsel for defendants as to the alleged consequences of delay in implementation of the Program. These claims are not supported by any facts supplementing the record. Even so, the Court is prepared, if defendants request it, to order trial on the merits within two weeks or on any other early trial date defendants may reasonably request.

1. Defendants shall not conduct compulsory urinalysis testing of any Bureau of Prisons employee as to whom there is no reasonable suspicion that drug use by that employee impairs his or her ability to perform official duty.

2. The stated restraint is the only one mandated by this injunction.

3. Security pursuant to Fed.R.Civ.P. 65(c) is set in the amount of $0.00, and no bond need be posted.

4. Defendants may move for modification of the preliminary injunction at any time upon producing evidence that heretofore or hereafter drug use by employees has resulted, or hereafter results, in significant dereliction of employee duty or other genuine danger of any kind in connection with the safe and efficient acquittal of the responsibilities of the Bureau of Prisons. The plaintiffs may so move upon any solid factual showing that any portion of the drug testing Program not here enjoined contravenes the lawful rights of any employee.

5. This injunction is binding on defendants, their officers, agents, servants, employees and attorneys, as well as upon those persons in active concert or participation with them or any of them, who receive actual notice hereof by personal service or otherwise.

6. No person who has notice of this injunction shall fail to comply with its letter and spirit. Nor shall any person subvert its letter or spirit by any sham, indirection, or other artifice.

7. The Court retains jurisdiction to modify this injunction at any time and from time to time on its own motion or upon the motion of any party in the interest of effectuating its intendments or in the interest of furthering the ends of justice under all applicable law.