AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 1533, et al., Plaintiffs,

v.

Richard B. CHENEY, Secretary of Department of Defense, et al., Defendants.

NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., Plaintiffs,

v.

H. Lawrence GARRETT, Secretary of the Navy, et al., Defendants.

METAL TRADES DEPARTMENT, et al., Plaintiffs,

v.

H. Lawrence GARRETT, Secretary of the Navy, et al., Defendants.

Nos. C88–3823–DLJ, C89–4112, C89–4443.

United States District Court, N.D. California.

March 15, 1990.

Anne Wagner of the AFGE Gen. Counsel's Office, Washington, D.C., and Michael Rubin of Altshuler & Berzon, San Francisco, Cal., for plaintiff American Federation of Government Employees ("AFGE").

Jeffrey Sumberg, Staff Atty., Washington, D.C., for plaintiff Nat. Federation of Federal Employees ("NFFE").

David Rosenfeld of Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., and Beth A. Jacobson of O'Donoghue & O'Donoghue, Washington, D.C., for plaintiff Metal Trades Dept. AFL–CIO ("Metal Trades").

David Rosenfeld of Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for intervenor United Ass'n of Plumbers & Pipe Fitters, Local 127.

Asst. U.S. Atty. Shawn B. Jensen and Captain Ray Lee of the Office of Civilian Personnel Management, Arlington, Va., for all defendants.

James E. Eggleston, San Francisco, Cal., and Julia L. Akins of Silver Spring, Md., for the Intern. Federation of Professional and Technical Engineers ("IFPTE") on its application to intervene as a plaintiff.

## ORDER REGARDING CROSS–MOTIONS FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT

JENSEN, District Judge.

On January 31, 1990, in a consolidated hearing the Court heard plaintiffs' motions for preliminary injunction and defendants' motions for summary judgment as to disputed provisions of the Department of the Navy's Drug–Free Workplace Program drug testing plan for civilian employees ("the Plan").

At the hearing the Court GRANTED IFPTE's motion to intervene and gave IFPTE and defendants leave to file further briefing on random testing of personnel holding top secret with access security clearances.

The scope of hte drug testing plan under challenge here is quite broad, designating approximately 80,000 civilian Naval employees in over 100 separate job positions for potential random drug testing; in addition, all civilian Naval employees, number-

ing over 300,000 worldwide, will be subject to the post-accident and reasonable suspicion testing provisions of the Plan. The legal challenge is almost as broad, challenging the post-accident and reasonable suspicion provisions as well as the random testing provisions for all but a handful of the designated job positions.

Based on the briefs and supporting evidence submitted by the parties, the oral argument of counsel, and the applicable law, the Court hereby PARTIALLY GRANTS the motions for PRELIMINARY INJUNCTION, as to identified provisions of the Plan. The Court also PARTIALLY GRANTS the motions for SUMMARY JUDGMENT as to other identified provisions of the Plan.

## I. BACKGROUND

### A. The Present Litigation

The Department of the Navy employs over 325,000 civilian at its activities and bases around the world. The Navy developed and adopted a Drug–Free Workplace Program to comply with Executive Order 12,564, 51 Fed.Reg. 32,889 (1986) (E.O. 12,-564), which directed the heads of all executive agencies to "develop a plan for achieving the objective of a drug-free workplace." *Id.* § 2(a). As part of such a plan, urinalysis drug testing programs were ordered to be developed within each agency to test for drug use under certain circumstances, in particular, to detect "the use of illegal drugs by employees in sensitive positions" within the federal civil service. *Id.* § 3(a).

These lawsuits were brought by collective bargaining agents (hereinafter collectively referred to as "the Unions") who represent employees subject to testing under the Plan. The Unions allege that the Plan violates their members' Fourth Amendment right to be free of unreasonable searches as well as violating the Civil Service Reform Act of 1978, which prohibits disciplining federal employees for off-

duty misconduct which does not adversely affect job performance.

The actions were consolidated on February 2, 1990. Pursuant to a stipulation entered by the parties in Case No. C88–3823 on September 28, 1989, notice of any implementation of the Plan was required to provide the Unions sufficient time to file for preliminary injunction of the challenged aspects of the Plan. On December 1, 1989, the first 30–day notices of testing issued, and by its Order Issuing Stay, dated December 29, 1989, the Court stayed implementation of the Plan pending disposition of the present motions.

### B. The Navy Drug Testing Plan

1. Types of Drug Testing.

The Plan is embodied in Civilian Personnel Instruction 792–3, issued June 30, 1989 (cited herein as "OCPMINST 12792.3"). The Plan establishes four types of urinalysis drug testing for all employees under certain circumstances: (1) testing upon reasonable suspicion of illegal drug use; (2) testing following occurrence of an accident or unsafe practice ("post-accident testing"); (3) voluntary testing; and (4) testing as part of or as a follow-up to drug counseling or rehabilitation. OCPMINST 12792.3 at 23–26.

2. Testing Designated Job Positions.

The Plan further requires random urinalysis testing of employees in 45 identified job classifications, known as "Testing Designated Positions" ("TDPs"). OCPMINST 12792.3 at 17–23. Six of these classifications are "Automatic" TDPs—i.e., subject to random testing regardless of specific job duties;[1] and 39 are "Job Function" TDPs—designated positions in which employees are subject to testing only if their duties involve "national security; protection to life and property; law enforcement; drug/alcohol rehabilitation; public health and safety; or operation or maintenance of transportation or major mechanical or elec-

---

1. The Automatic TDPs are: Presidential Appointees; Top Secret Clearance with Access; Nuclear Weapon Personnel Reliability Program; Military Sealift Command, Nuclear Weapon Personnel Reliability Program; Military Sealift Command Civilian Mariners; Navy Drug Screening Laboratory Employees.

trical equipment." [2] *See* Testing Designated Position List, App. E to OCPMINST 12792.3 at E–4 to E–8 (hereinafter "TDP List"). Applicants for any of these positions are subject to a one-time drug test as part of their application. OCPMINST 12792.3 at 28.

The Unions here do not challenge the voluntary, followup, or applicant testing provisions in the Plan. Further, no challenge is made to the program of testing applicants for TDPs. Finally, plaintiffs do not seek preliminary relief for the following TDPs designated for random testing: Presidential Appointees; Nuclear Weapon Personnel Reliability Program; Military Sealift Command, Nuclear Weapon Personnel Reliability Program; Military Sealift Command Civilian Mariners; Navy Drug Screening Laboratory Employees; and those holding Air Traffic Control positions.

Thus, the features of the Navy Plan presented for the Court's review on these motions are (1) random testing of employees holding Top Secret Clearances with Access and employees in Job Function TDPs (other than Air Traffic Control personnel); (2) the post-accident testing provisions; and (3) the reasonable suspicion testing provisions.

3. Drug Testing Procedures.

Procedures for specimen collection, testing, and chain of custody follow the "Mandatory Guidelines for Federal Workplace Drug Testing Programs" ("HHS Guidelines"), 53 Fed.Reg. 11,970 (April 11, 1988). A general notice announcing the Plan was sent to Navy civilian employees on or about September 1, 1988. Reasonable suspicion and post-accident specimen collections will be scheduled upon approval following the precipitating event. OCPMINST 12792.3 at 23, 26.

Under the Plan, employees found to work in TDPs will receive 30 days notice that their positions have been found to meet the criteria and justification for random testing.[3] OCPMINST 12792.3 at 11. An employee subject to random testing will be informed approximately two hours in advance that a urine specimen will be collected, and will be notified of the exact time and location of the specimen collection approximately 30 minutes in advance. OCPMINST 12792.3 at 21.

The Plan requires that all urine samples be tested for the presence of five drugs: cocaine, marijuana, amphetamines, opiates, and phencyclidine (PCP). In cases of reasonable suspicion or post-accident testing, the Navy may also test for any drug in Schedules I and II of the Controlled Substances Act, 21 U.S.C. § 812. OCPMINST 12792.3 at 11.

All urine samples will be initially screened using the Radio–Immuno–Assay ("RIA") technique. If this test is positive for the presence of drugs, a more accurate gas chromatography/mass spectrometry ("GC/MS") confirmatory test will be performed. HHS Guidelines § 2.4(g)(2). All positive laboratory results must be reviewed and verified by a Medical Review Officer before they are reported as positive. HHS Guidelines § 2.7(c). An employee whose test is reported by the laboratory as positive will have an opportunity to present the Review Officer, a physician knowledgeable about substance abuse problems, with evidence of a legitimate rea-

---

**2.** The 39 broad categories of Job Function TDPs (each of which may include more than one position title and series per category) are: Security Administration; Intelligence Operations; Firefighter; Air Traffic Control; Railroad Dispatcher; Aircraft Attendant; Law Enforcement; Drug/Alcohol Rehabilitation Facility; Medical; Nursing; Health Technician Services; Pharmacist; Dental Services; Pilot/Navigator/Flight Engineer; Electronic; Electrical Installation & Maintenance; Aircraft Repair; Instrument Mechanic; Cargo Handling; Welder Positions; Sheet Metal Mechanic; Boilermaker; Ship Structural Worker; Pipefitter; Utility Systems; Gas Detection Monitor; Rigging; Shipwright; Machinery/Equipment Mechanic; Mobile Equipment Operator; Motor Vehicle Operator; Boat Operation; Braker–Switcher/Conductor; Locomotive Engineer; Transportation and Mobile Equipment Repair; Explosive/Dangerous Material; Ordnance Equipment Repairer; Small Arms Repairer; and Parachute Packer.

**3.** Application of the Plan's generalized "criteria and justifications" for classifying any given position as a TDP subject to random testing is discussed more fully in Part III.A.2 below.

son for the result, such as a doctor's prescription. OCPMINST 12792.3 at 31–32. If the Review Officer determines that there is no medical justification for the positive result, the result will be considered a verified positive result with the consequences discussed below.

Direct observation of urination to provide a testing specimen is permitted under the Plan "[i]f an activity/command has reason to believe that the individual may alter or substitute the specimen." OCPMINST 12792.3 at 13. Testing based on reasonable suspicion of drug use is one circumstance which may provide such reason to believe that tampering is possible; however, the Plan does not require that all reasonable suspicion testing be conducted under direct observation. *Id.*

Other standard collection procedures further require the employee subject to testing to produce photo identification upon arriving at the collection site; to wash and dry hands before providing the specimen; and to remove "unnecessary outer garments" and surrender personal belongings to the collection site coordinator. App.D to OCPMINST 12792.3. The collection site coordinator "secures" the testing area by placing bluing agents in the toilet water and turning off all other sources of water. While the employee is urinating inside the closed stall, the coordinator is to remain aware of "unusual sounds, behavior, or delays" by the employee. Upon receipt of the specimen, the coordinator measures its temperature and checks for proper color and the presence of contaminants. *Id.* If the coordinator observes anything which provides reason to believe that the specimen has been altered or tampered with, the coordinator must obtain a second specimen as soon as possible, which may be required to be provided under direct observation. *Id.*

4. Sanction for Positive Test Result.

If the urinalysis produces a positive test result and the Medical Review Officer determines that there is no alternative medical justification for such positive result, the result is considered "verified positive" and evidence of illegal drug use. OCPMINST 12792.3 at 31–32. Upon a determination of illegal drug use, the employee must be referred to the Civilian Employee Assistance Program ("CEAP"), and, if in a sensitive position, the employee must be immediately removed from that position through appropriate personnel action. OCPMINST 12792.3 at 33.[4] An employee may be subject to disciplinary action, including termination, for refusal to obtain counseling following a verified test result or upon a second finding of illegal drug use. OCPMINST 12792.3 at 33. Disciplinary action must be in accordance with the requirements of applicable collective bargaining agreements. OCPMINST 12792.3 at 34.

An employee may avoid discipline for illegal drug use by voluntarily identifying himself or herself as a user to a supervisor, if in addition the employee: (1) obtains counseling and rehabilitation through the CEAP; (2) agrees to followup drug testing; (3) consents in writing to the release of all records relating to use or rehabilitation to CEAP and "appropriate management officials;" and (4) subsequently refrains from illegal drug use. OCPMINST 12792.3 at 12.

This "safe harbor" is not available after notification of a scheduled drug test or after providing a testing specimen, nor under circumstances where other evidence of illegal use has become available but is not yet known to the employee's supervisors. OCPMINST 12792.3 at 33.

5. Sanction for Refusal to Provide Urine Specimen.

An employee who refuses to appear at a scheduled test or to submit to testing, regardless of the type of circumstances mandating the test (whether random, post-accident, or reasonable suspicion testing, for example), is subject to the "same range of

---

**4.** The employee may be returned to the sensitive position as part of a rehabilitative or counseling program "if it would not endanger public health, safety or national security." OCPMINST 12792.3 at 33.

discipline" available for an employee who has a verified positive test result. OCPMINST 12792.3 at 14. Therefore, an employee may be subject to termination for refusing to submit to urine testing.

## II. APPLICABLE LEGAL STANDARDS

### A. Preliminary Injunction

The standard for determining whether a preliminary injunction should issue is well settled within the Ninth Circuit. *See Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215 (9th Cir.1987); *San Diego Comm. Against Registration and the Draft v. Governing Board of Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986); *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir.1985). "To qualify for a preliminary injunction the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Rodeo*, 812 F.2d at 1217. These are not two distinct tests, but rather the opposite ends of a single "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Id.* (quoting *San Diego Comm.*, 790 F.2d at 1473 n. 3).

 It is established that violation of an individual's constitutional right to be free from unreasonable searches as articulated in the Fourth Amendment causes irreparable harm. *LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir.1985), *modified on other grounds*, 796 F.2d 309 (9th Cir.1986); *Zepda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983). It is also settled that urine testing implicates the civil liberties guaranteed by the Constitution as such testing must be deemed Fourth Amendment searches. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989). The protection guaranteed by the Fourth Amendment against unreasonable drug testing applies even when such testing is carried out by the federal government acting as an employer. *O'Conner v. Ortega*, 480 U.S. 709,

717, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987). Accordingly, the court holds that plaintiffs in the present case will suffer irreparable injury as a matter of law if the Plan constitutes an unreasonable search and is not enjoined.

In order to meet the standard for preliminary injunction, the Unions must show, in addition to exposure to irreparable injury, a likelihood of success on the merits. Plaintiffs' showing in this respect is closely connected with the showing they must make to defeat the Navy's motion for summary judgment that the provisions of the Plan are constitutional. Therefore, the legal standard for summary judgment is discussed below.

### B. Summary Judgment

1. General Principles of Rule 56.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law."

 In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.'" *T.W. Electric Service, Inc. v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1983); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986)) (emphasis in original). When judging the evidence at the summary judgment stage, the Court does not make credibility determinations or

weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party. *T.W. Electric,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Summary judgment may issue "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 106 S.Ct. at 2552. The standard for judging either a defendant's or plaintiff's motion for summary judgment is the same standard used to judge a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

2. Summary Judgment in Drug Testing Programs.

On a motion for summary judgment involving the constitutionality of drug testing programs, there is no clear guidance on which party bears the burden. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), contains language indicating that, as with other Fourth Amendment cases, the government bears the burden of proving that its search is reasonable. *See id.* at 1396 (finding that the government had "demonstrated that its compelling interests in safeguarding our border and the public safety outweigh the privacy expectations" of personnel designated for drug testing). *See also AFGE v. Skinner,* 885 F.2d 884, 894 (D.C.Cir.1989) (hereinafter *AFGE (Transportation)*) (considering without resolving the issue of burden in view of *Von Raab* on the one hand and a civil rights plaintiff's obligation to prove the illegality of the government's conduct on the other).

In deciding a motion for summary judgment, the Court considers whether the Un- ions have raised an issue as to the reasonableness of each challenged provision, and only for provisions where no genuine issue is raised will summary judgment be granted. This procedure is proper as a means of enjoining only unreasonable testing and compelling the government, where it wishes to expand its testing program, to fashion such an expanded program to meet constitutional requirements. *See Harmon,* 878 F.2d at 490–91.

In considering the reasonableness of separate provisions, the Court relies on principles underlying the developing law *regarding* the constitutionality of federal employee drug testing programs and will require the following standards to justify a grant of summary judgment:

 *a. Random testing.* The Court finds that at a minimum summary judgment in favor of the Navy for a random testing program requires that no material issue of fact remain regarding the direct nexus between the duties of each employee in a testing designated position and the governmental concerns identified by the Navy. *See Harmon v. Thornburgh,* 878 F.2d 484, 490 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).

Pursuant to the remedial principles announced in *Harmon,* the Court need not, and indeed should not, redraw categories of workers to distinguish those who constitutionally may be tested from those who may not. *See generally,* 878 F.2d at 493–95. In the interest of avoiding unnecessary rulings, the Court will not infer that, if the Navy can test only some employees holding a certain position, it would choose to test them and not the rest. Further, "[c]ourts ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule. [footnote omitted]." *Id.* at 494. Therefore, the Court will not draw lines that the Navy itself has not drawn, and where a job position designated for testing is described in terms so broad as to necessarily include positions not constitutionally

testable, the Court will enjoin testing of the designated position.

■ *b. Post–Accident Testing.* To obtain summary judgment in its favor on the post-accident testing provisions of the Plan, the Navy must show at a minimum that the events triggering testing meet some threshold level of severity in terms of potential harm and actual personal injury or property damage, and that the testing covers only employees who may have caused the accident. *Connelly v. Newman,* 753 F.Supp. 293 (N.D.Cal.1990); *see also National Treasury Employees Union v. Yeutter,* 733 F.Supp. 403, 416 (D.D.C.1990) (identifying apparent cause of a triggering event as an acceptable substitute for particularized suspicion). Thus, only employee duties "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 1419, 103 L.Ed.2d 639 (1989), will support the Navy's interest in post-accident testing.

■ *c. Reasonable Suspicion Testing.* To obtain summary judgment on the reasonable suspicion testing provisions of its Plan, the Navy must show that the criteria for reasonable suspicion are limited to indicia of suspicion which make the risk of current on-duty impairment more probable than not. *AFGE v. Cavazos,* 721 F.Supp. 1361, 1376–77 (D.D.C.1989); *Yeutter, supra,* 733 F.Supp. at 415–16.

### C. Legal Framework of Urinalysis Drug Testing and the Fourth Amendment

In considering these motions and constitutionality issues raised by the Navy Plan, the Court applies the legal framework recently developed through the two leading Supreme Court decisions and the D.C. Circuit decisions which have interpreted and refined them: *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 1419, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Harmon v. Thornburgh,* 878 F.2d 484, 490 (D.C.Cir.1989),

*cert. denied,* —— U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990); *NFFE v. Cheney,* 884 F.2d 603 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); and *AFGE (Transportation),* 885 F.2d 884, 894 (D.C.Cir.1989). See *National Treasury Employees Union v. Yeutter,* 733 F.Supp. 403, 416 (D.D.C.1990), for a cogent discussion of the development through these cases of general principles guiding the Court's analysis of the constitutionality of urinalysis searches in the context of federal employment.

■ Due to the groundwork laid in these decisions, certain principles are no longer controversial and need only to be recollected here. First, while government-sponsored urine testing for drug use must be deemed a search under the Fourth Amendment, *Skinner,* 109 S.Ct. at 1413, not every invasion of privacy is forbidden under the Fourth Amendment, because the Fourth Amendment forbids only unreasonable searches. *Id.* at 1413–14; *Von Raab,* 109 S.Ct. at 1390; *AFGE (Transportation),* 885 F.2d at 889. Where special governmental needs beyond law enforcement require the intrusion, probable cause and even individualized suspicion may not be required to satisfy constitutional standards. *Von Raab,* 109 S.Ct. at 1390; *Skinner,* 109 S.Ct. at 1414. Rather, courts must "balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab,* 109 S.Ct. at 1390.

This balancing test is applicable even where there is no documented drug problem within the governmental agency seeking to conduct drug testing. *Harmon,* 878 F.2d at 487; *AFGE (Transportation),* 885 F.2d at 895. Therefore, on the present motions, it is irrelevant whether there is a factual dispute regarding documented drug use among Navy civilian employees. Another factor that may be considered in this balance is whether a given job position is in the field, or in a "traditional office environment" where detection of drug use by means less intrusive than urinalysis can be

achieved. *Von Raab* 109 S.Ct. at 1395; *but see Harmon*, 878 F.2d at 492 (government's compelling interest in protecting truly sensitive information may override consideration of this factor).

While the leading cases have established a few categories of workers to whom drug testing programs may apply as a matter of law, each challenged provision of a program with the scope of the Navy Plan must be scrutinized for compliance with this guiding rule: "[T]he government may search its employees only when a clear, direct nexus exists between the nature of the employee's duty and the nature of the feared violation." *Harmon*, 878 F.2d at 490. Where the challenged plan fails to demonstrate such a nexus, injunction is an appropriate remedy until such time as the agency refashions its program to meet constitutional requirements. *See id.* at 490–91.

## III. CONSTITUTIONALITY OF THE NAVY PLAN

### A. Random Testing Provisions

The Navy Plan's random testing program is subject to the same fundamental balancing approach as are the post-accident and reasonable suspicion testing provisions. In the case of random testing, "the random nature of the [ ] testing plan is a *relevant* consideration; and, in a particularly close case, it is possible that this factor would tip the scales." *Harmon*, 878 F.2d at 489. This mandate for "case-by-case balancing of individual and societal interests," *id.* at 490 n. 9, serves as a caution to the Court in considering a motion for summary judgment. Before holding a random testing plan constitutional as a matter of law, without examination of facts justifying random testing of all individuals in a certain job position, the Court will require the Navy to show a markedly more compelling government interest in an environment of markedly reduced privacy expectations. The classic example is workers in nuclear power plants. *Rushton v. Nebraska Pub. Pwr. Dist.*, 844 F.2d 562 (8th Cir.1988); *see also Harmon*, 878 F.2d at 491–92, *discussed below* (employees holding top secret securi-

ty clearances); *AFGE (Transportation)*, 885 F.2d at 892 (motor vehicle operators responsible for transporting sensitive information).

In the current state of the law, the courts have recognized three specific governmental interests which may be found to be sufficiently compelling to justify suspicionless drug testing: (1) maintaining the integrity of workers in executing their essential mission; (2). enhancing public safety; and (3) protecting "truly sensitive information." *Harmon*, 878 F.2d at 488 (citing *Von Raab*, 109 S.Ct. at 1393, and *Skinner*, 109 S.Ct. at 1419). The Navy Plan goes beyond these three interests and identifies its own, partially intersecting, areas for concern: "national security; protection to life and property; law enforcement; drug/alcohol rehabilitation; public health and safety; [and] operation or maintenance of transportation or major mechanical or electrical equipment." OCPMINST 12792.3 at E–4 to E–5.

In determining which job positions should be tested in service of these interests, the Navy first determined that certain positions met the criteria of E.O. 12564 "sensitive positions" without consideration of specific duties at any identified positions. These were designated "automatic" TDPs, a designation which comprises presidential appointees; employees holding top secret clearance with access; nuclear weapon personnel reliability program; military sealift command, nuclear weapon personnel reliability program; military sealift command civilian mariners; and navy drug screening laboratory employees. At oral argument counsel for the Unions indicated that these automatic TDPs are not challenged in this action, with the exception of employees holding top secret clearance with access. Therefore, only that category is discussed here.

### 1. Top Secret Clearance with Access.

Plaintiff IFPTE contends that the Navy Plan's designation for random drug testing of all holders of security clearances identified as "top secret with access" is

unconstitutional because it has not been demonstrated that holders of these clearances necessarily handle top secret materials in the course of their duties. IFPTE has provided a declaration of an employee who certifies and tests the installation of communications equipment which is used in conjunction with cryptographic equipment. The declarant states that far from having actual access to top secret material, elaborate security measures are in place at all times to *prevent* his access to such material while he is working on the equipment.

While *Von Raab* impliedly invalidated an element of the Customs Service program which did not assure that only those "likely to gain access" to sensitive material would be subject to random testing, 109 S.Ct. at 1396–97, the Court believes that *Harmon* has disposed of this issue. 878 F.2d at 491–92. In view of the Navy's compelling concern in protecting all aspects of the handling of materials classified top secret, this designation for random testing must be permitted as a matter of law.

First, the program in *Von Raab* addressed "classified material," information certainly not as sensitive as top secret material, "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to national security." 47 Fed.Reg. 14,874 (Apr. 6, 1982). "Whatever [*Von Raab*'s recognition of protecting] 'truly sensitive' information includes, we agree that it encompasses top secret national security information." *Harmon*, 878 F.2d at 491 (footnote omitted).

As here, the D.C. Circuit in *Harmon* also considered the merit of a contention that many employees holding security clearances may never have actually seen top secret information, deciding:

[o]n balance ... it would not be desirable to ask the Department to draw distinctions, within the class of attorneys holding top secret security clearances.... The whole point of granting top secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises.

*Id.* at 492. The Court does not find that the distinction IFPTE wishes to draw, between employees whose job involves viewing top secret information and employees whose job involves assuring the reliability of equipment used to convey the information, is any more desirable than that rejected in *Harmon*. The requirement for a top secret with access clearance for a communications technician may exist to provide an additional level of security for the information in the event the other, physical precautions fail. This procedure is supportable where disclosure of the information poses a grave risk to national security.

The Court's earlier opinion in *Connelly v. Horner*, No. 88–5085–DLJ, slip op., 1989 WL 125011 (N.D.Cal., June 15, 1989), is not to the contrary. There, the issue of access to sensitive information was raised to justify testing of *all* Office of Personnel Management ("OPM") investigators, even those who did not hold "Q" clearances. *Id.* at 14. It was conceded that only a small minority of the group designated for testing held such clearances. *Id.* at 17. Here, by contrast, the group is defined as those holding a clearance which formally grants them access to top secret materials.

The OPM also conceded in *Connelly* that those holding the clearance did not, in fact, have regular access to sensitive materials. *Id.* Therefore, the issue of whether the Court should consider evidence of regular access in deciding the reasonableness of randomly testing security clearance holders was not decided at that time.

After the Court issued its ruling on the OPM plan, the D.C. Circuit answered the question of whether evidence of regular access was required before holders of top secret clearances could be subject to random drug testing in *Harmon*. There, the court expressly declined to draw distinctions between "attorneys who do and those who do not deal with such materials on a regular basis," 878 F.2d at 492, finding that *Von Raab* permits the government to make submission to drug testing a requirement for access to top secret materials, and thus for holding a top secret security clearance. *Id.*

Finally, holders of top secret clearances have a greatly reduced expectation of privacy, in that they are subject to an initial background investigation and reinvestigation at five-year intervals in order to receive and maintain a top secret security clearance. OPNAVINST 5510.1H (Apr. 29, 1988).

For all these reasons, the Court finds that the automatic testing designation for holders of top secret clearances with access must be held constitutional as a matter of law. Therefore, the motion for preliminary injunction is DENIED as to this classification. Defendants' motion for summary judgment is GRANTED, and the stay of testing is lifted as to the automatic TDPs.

2. Job Function Testing Designated Positions.

To determine positions which would be subject to testing based on individual job functions, the Navy initially reviewed its civilian job positions and grouped those position titles and series that were perceived to involve the six identified areas of concern: national security; protection to life and property; law enforcement; drug/alcohol rehabilitation; public health and safety; and operation or maintenance of transportation or major mechanical or electrical equipment. OCPMINST 12792.3 at E–4 to E–8.

These initially designated TDPs are subject to random drug testing only if the local activity head or commander determines, for each identified position title and series, that the particular duties of that position at the local activity or base actually involve these areas of concern. OCPMINST 12792.3 at E–1. An activity head/commander may not designate for testing any position title or series that does not appear on the TDP list. OCPMINST 12792.3 at E–10. The local positions so identified then form the pool of employees actually subject to random drug testing.

The Court finds that, with narrow exceptions, this approach has two flaws fatal to a finding of constitutionality at this stage: first, the broad areas of concern go far beyond governmental interests acknowl-

edged by the courts to be "compelling;" and second, the Plan places impermissible discretion in the hands of local officials to determine who will be subject to drug testing.

In reviewing the overall Navy Plan, the Court is required to conduct a case-by-case balance of identified governmental interests against individual privacy expectations to uphold random drug testing for any single TDP. As primary concern, the Navy's wholesale approach to designating positions for random testing does not lend itself to this balancing process.

The Navy Plan draws job position testing lines to include within in a single position category both those involving duties "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," and those involving mere record-keeping or mechanical duties for which "disastrous consequences" seem remote. The developing law firmly demonstrates that compelling interests in public safety and protection of sensitive information, as well as mission integrity, are adequately served through narrowly tailored, constitutional drug testing programs. Further, within the very broad classifications of TDPs identified by the Navy there may be many cases close enough that the fact that testing is random, rather than event-triggered, may very well tip the scales.

The Court finds that most of the offered justifications of random testing TDPs do not provide sufficient information on the direct nexus between legitimate compelling Navy interests and the feared harm of drug impairment at a designated position. And, as discussed above, the appropriate remedy is not for the Court to redraw the lines of the Plan, but to enjoin invalid categories and leave the Navy to refashion its plan to meet constitutional standards.

In the first place the Court cannot accept the Navy's broad areas of concern as a substitute for the recognized compelling interests governmental interests of mission integrity, public safety, and protection of truly sensitive information. While the

Navy's defined interests may encompass these, the interests are so broadly defined as to diffuse their assertedly "compelling" nature. Indeed, the Navy interests are so broadly defined as to describe virtually any duties of civilian Navy employees, notwithstanding the fact that only certain positions have been selected as initial TDPs. Thus, to accept without examination the Navy's identified interests in drug testing is much the same as permitting employees to be tested simply because they work for the Navy. Because "federal employment alone is not a sufficient predicate for mandatory urinalysis," *Harmon*, 878 F.2d at 490, the simple fact that the Navy's mission is tied to national defense will not support broad discretion to test all employees. Although there is a reduced expectation of privacy for federal employees at the workplace, these individuals do not forfeit their Fourth Amendment rights "merely because they work for the government instead of a private employer." *O'Conner v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987).

Therefore the Court considers first whether for each identified concern a sufficient nexus has been shown between the TDPs categorized under each and a recognized compelling government interest. For those TDPs for which such nexus does exist, the Court then examines the impact of the local activity or commander's discretion in designating the testing pool.

### a. Operation or maintenance of equipment

█ The courts have not given express recognition to "equipment maintenance" as a governmental interest necessarily overriding the legitimate privacy concerns of workers involved in such maintenance. Certainly equipment maintenance is critical to the smooth functioning of naval operations, including crucial missions of national defense. However, the recognized concern where certain equipment, such as aircraft, trains and nuclear vessels, is involved, is clearly public safety rather than the smooth functioning of the equipment.

The Court will therefore require the Navy to show a direct nexus with the feared harm of drug-impaired workers involved in equipment maintenance only for equipment demonstrated to present a grave risk to public safety in the event of a malfunction. Such nexus can be found in the Plan only for motor vehicle operator positions, *AFGE (Transportation)*, 885 F.2d at 892–93; *Yeutter*, 733 F.Supp. at 414–15, locomotive engineer positions, *Skinner;* pilot/navigator/engineer positions, *NFFE v. Cheney*, 884 F.2d at 610; and boat operation positions.

The duty descriptions for these four positions make clear that *all* incumbents, by definition, have regular duties in operating major vehicles, which routinely carry passengers, such that a single lapse could lead to disastrous consequences, potentially involving death or major injury. *See* Att. 1 at 20, 38, 39, 41. By contrast, other designated "operator" positions, such as "mobile equipment operator positions," refer vaguely to "heavy-duty, special purpose equipment ... used in heavy construction and repair." Att. 1 at 37. While the Court may recognize that operation of some of the described equipment, such as cranes, carries a potential for disastrous consequences resulting from a momentary operator lapse, the Court will not draw lines the Navy itself has chosen not to draw. Rather, the Court regards the position description overbroad on its face, and will invalidate the entire description.

Because no sufficient nexus has been shown for the many other positions grouped in this category, the motion for preliminary injunction as to positions involved in equipment maintenance and operation is GRANTED, except for the four transportation operator positions described above. Summary judgment as to the category with the noted exceptions is DENIED.

### b. Public health and safety

█ Similarly, the Navy's expansion of the recognized interest in public safety to "public *health* and safety" provides the only nexus to justify random testing of such positions as pathology technicians, di-

agnostic radiologic technicians, and dental hygienists. Again, it is doubtful that such designations for testing can stand when this interest is properly circumscribed to fall within the class of interests recognized as compelling. Therefore, the Court GRANTS the motion for preliminary injunction for all TDPs in the "public health and safety" category. The motion for summary judgment is DENIED as to this category.

The Court finds the identified concerns of "national security," "protection of life and property," and "drug/alcohol rehabilitation" each to be impermissibly overbroad as demonstrated by the individual TDPs. These are discussed briefly below with citations to Attachment 1 to Appendix E to the Plan (hereinafter "Att. 1").

### c. National security

■ While "national security" encompasses protection of truly sensitive information, "planning, advisory, operational or evaluative work to develop and implement policies and procedures" to deal with such information, Att. 1 at 7, does not state a nexus of equal import with actual access to truly sensitive information. Employees may certainly work with the concept of national security information without having access to it. Any of these positions overlapping with top secret clearance with access are already subject to testing under that TDP. Therefore, the motion for preliminary injunction is GRANTED as to all TDPs in the national security category, as to any employees in those positions who do not top secret with access clearances. Summary judgment as to this category is DENIED.

### d. Protection of life and property

■ The concern for "protection of life and property" impermissibly broadens the recognized compelling interest in public safety by, for example, designating for testing railroad dispatchers who "maintain records of car movements and the contents of cars," Att. 1 at 11. While some ultimate danger to the public may conceivably derive from inaccurate records as to railcar

whereabouts, this threat is far too attenuated to justify random drug testing. However, the Court finds that the firefighter positions included in this category provide the sufficient nexus to public safety. Therefore, some nexus may exist for firefighter positions.

### e. Drug/alcohol rehabilitation

■ The Plan's identified interest in drug and alcohol rehabilitation derives from the "integrity of essential mission" interest identified in *Harmon* and applied to drug counselors in *NFFE v. Cheney*, 884 F.2d 603, 614 (D.C.Cir.1989). In that case, the D.C. Circuit found that the basic concern that drug-using drug counselors would be unsympathetic to their mission was made "all the more pressing because of a drug counselor's full-time, largely unstructured contact with drug users." *Id.* The Court notes that the TDPs under this category include those who "support" counseling, such as by analysis and interpretation of psychological data. Att. 1 at 14. Such employees do not have an "assigned duty to counsel against the use of drugs," as did the counselors in *Cheney.* but duties which may be conducted without contact with those in drug rehabilitation programs at all. Therefore, the Court finds that no sufficient nexus has been shown for drug/alcohol rehabilitation facility positions, and the motion for preliminary injunction is GRANTED as to these TDPs. The motion for summary judgment is DENIED.

### f. Law enforcement

■ As to the Plan's "law enforcement" concern, the Supreme Court has recognized that federal employees who carry firearms may be subject to drug testing because the ability to use deadly force clearly defines a job duty "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Von Raab*, 109 S.Ct. at 1393 (quoting *Skinner*, 109 S.Ct. at 1419). The description for all TDPs classified as "law enforcement positions" states that all incumbents "are armed." Att. 1 at

13. The Supreme Court has identified this job duty as one justifying drug testing.

The Unions do not argue that any of the law enforcement TDPs do not carry firearms; rather, they assert that employees in these positions do not face a regular threat of violence. This contention, though substantial, was found inadequate to overcome the interest in public safety in protecting against the possibility that firearms will be in the hands of drug impaired individuals. *Cheney*, 884 F.2d at 612. Therefore, the Court finds the required nexus to be established.

**3. Discretion in Local Officials.**

■ In the context of the Navy Plan, unlike other drug testing plans examined by the courts, establishing the nexus between job duties and feared harm is not the end of the inquiry. While the Navy Plan dictates ample detail in many respects, it is unusual among drug testing plans considered by the courts in leaving crucial elements to the discretion of local officials who also have responsibility for implementing the drug testing plans. Specifically, local activity/command heads (1) determine which individual positions under their supervision will be subject to random testing by applying the "justification criteria" described in the Plan, OCPMINST 12792.3 at 17; and (2) establish criteria—based upon examples offered in the Plan—for events that will trigger post-accident testing,[1] OCPMINST 12792.3 at 26.

Such local discretion stands in stark contrast to the plan approved in *Skinner*, in which "[b]oth the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them." 109 S.Ct. at 1415. The Supreme Court noted in particular that "in light of ... the minimal discretion vested in those charged with administering the program," the testing plan was suited for exemption from the warrant requirement. *Id.* at 1415–16.

Here, those charged with administering the random drug testing program are further vested with exceptional discretion to test some employees holding a certain position title and series but exempt others in the same position. The Navy's argument that discretion is limited by the random nature of the testing fails in view of the Plan provision permitting frequency of testing to be delegated to activities or commands below the level of Chief of Naval Operations. OCPMINST 12792.3 at 20. The rate of testing so delegated is subject only to the requirement to "optimize overall deterrence." *Id.* Such vague guidelines only increase the likelihood that some activity heads/commanders who perceive a far greater need for deterrence will mandate random testing on a far more frequent basis than others, perhaps to an unreasonably intrusive degree. Because the courts have determined that no showing of an existing drug problem is required for a random testing program, this additional level of local discretion cannot be tolerated.

The Court finds that, in order to properly limit local discretion, the justification criteria must be as specific as those employed for the Automatic TDPs. That is, the express criteria for a given Job Function TDP category must specify the nexus to a recognized compelling governmental interest as discussed above. In all other cases, the presence of local activity/command discretion diminishes the Navy's interests in testing a position even if it is conceivable that position may have a nexus with a recognized compelling interests.

The Court finds that random testing of law enforcement positions meets this test for undiminished interest. As discussed above, the government's compelling interest in testing law enforcement personnel lies in assuring that those who carry firearms are fit in all ways to use them safely. Because the Plan describes these positions as those in which incumbents are armed, Att. 1 at 13, no discretion is left for local

---

1. The impact of local discretion on the Plan's post-accident testing provisions is discussed in Part III.B. below.

commanders to test those who do not carry firearms in the course of their duty.

Therefore, the Court will DENY the motion for preliminary injunction of random testing of law enforcement positions. Summary judgment for defendants as to these positions is GRANTED, and the stay of testing is LIFTED.

■■■■ As to positions involved in protection of life and property, the Court notes that testing of air traffic control positions are not challenged in this action. Of the remaining identified TDPs, the Court notes that while the position of railroad dispatchers and aircraft attendant positions apparently have no described duties involved in the protection of human life, firefighters may very well involve duties fraught with the risk of injury following a single, momentary lapse. Navy firefighters' routine duties include rescuing persons endangered by fire, and they must "be prepared to deal with fire victims in varying states of fright and panic." Att. 1 at 9. This provides a sufficient nexus to the concern for public safety recognized by the courts as justifying random drug testing.

Therefore, in the category of TDPs identified as involving "protection of life and property," the motion for preliminary injunction is GRANTED as to railroad dispatchers and aircraft attendants, and as to those positions the defendants' motion for summary judgment is DENIED.

As to firefighters, the motion for preliminary injunction is DENIED, and summary judgment is GRANTED to defendants. The stay of testing firefighters is LIFTED.

■■■■ Finally, the Court considers whether the presence of discretion undermines the Navy's interest in testing motor vehicle operators, locomotive engineers, aircraft pilots, engineers and flight navigators, and boat operators. The Court believes that it does not. The position title "operator" makes clear that those holding such positions have regular duties in which a single lapse may cause serious injury or death, should such lapse cause a crash of a major passenger-carrying transport. This sufficiently limits local discretion to test only those recognized as having regular duties involving the compelling interest in public safety recognized in *Skinner*.

Therefore, the Court DENIES the motion for preliminary injunction and LIFTS the stay of testing as to these positions. Further, because the law is settled that these positions carry diminished privacy interests in view of the highly regulated nature of the transportation industry. *Skinner*, 109 S.Ct. at 1418. Therefore, the Court will GRANT summary judgment in favor of defendants as to these job positions.

### B. Post–Accident Testing Provisions

The Navy Plan mandates drug testing for "[a]ny employee involved in an on-the-job accident or who engages in unsafe, on-duty, job-related activity." OCPMINST 12792.3 at 26. Criteria for accidents or unsafe practices which will trigger testing are to be established by the local activity/command. *Id.* Rather than limit discretion to select accident criteria, the .Plan offers these "examples" of criteria that can be set: "An accident or unsafe practice which requires medical treatment or hospitalization, or results in death or damage to property at a certain dollar value."

The Court acknowledges that the Navy's interest in determining the cause of accident and otherwise ensuring the safety of its employees constitutes a "special need" which justifies post-accident testing in the absence of a warrant or probable cause. *See Von Raab*, 109 S.Ct. at 1390–91; *Skinner*, 109 S.Ct. at 1414. This Court therefore balances the Navy's interest in implementing post-accident testing and the employees' reasonable expectation of privacy. Because Navy employees are engaged in a wide variety of duties, from traditional office work to operation of major equipment necessarily implicating major public safety issues, the Court cannot generalize the privacy expectations of all Navy employees. Therefore, the Court focuses on the nature of the government's interest.

The Navy has presented no evidence of a history of drug related accidents comparable to that documented in *Skinner*. *See* 109 S.Ct. at 1409–10. Rather, the Navy

argue that the triggering standards are higher than those allowed in *Skinner*, in that each incident must be evaluated before testing "to determine whether the employee's actions may have contributed to the incident." OCPMINST 12792.3 at 26. This causation nexus was absent in the program approved in *Skinner*.

The Court agrees that one prong of the test for constitutionality of post-accident testing in the absence of a documented need is that the testing apply only to employees who may have caused the incident. *See Connelly v. Newman*, 753 F.Supp. 293 (N.D.Cal). Further, the Court finds that the Navy Plan, unlike the Office of Personnel Management Plan considered in *Connelly*, meets this causation requirement. However, there is clearly another prong of threshold level of severity which the Navy Plan does not satisfy.

■ The regulations in *Skinner* set a high threshold for post-accident testing, requiring at a minimum that an incident involve injury or damage to railroad property in of $50,000. 49 C.F.R. § 219.201(a)(2), *cited* 109 S.Ct. at 1408–09. By contrast, a local activity or command may require testing following any incident necessitating medical treatment (not even hospitalization) and resulting in damage of one dollar. Far from compelling, the interest in deterring such incidents through measures as intrusive as urinalysis testing are minimal indeed. *Compare Yeutter*, 733 F.Supp. at 406 (upholding a post-accident testing plan where testing was triggered by causation of one or more fatalities, or hospitalization of one or more persons, or property damage in excess of $10,000).

Further, leaving determination of specific triggering criteria in the hands of activity heads or commanders weakens any argument that Navy employees have a diminished expectation of privacy because they have notice of the circumstances under which they will be subject to testing, or that such testing is an effective deterrent to drug use which may cause serious accidents. *Cf. Skinner*, 109 S.Ct. at 1419–20.

Finally, it is important here that the post-accident testing provisions apply to all Navy civilian employees, regardless of their job duties. While the Court notes that certain job positions, as in *Skinner*, innately involve a high risk of devastating damage from a single drug-impaired failure, the Navy's post-accident testing provisions fail to make such potentially constitutional distinctions as a basis for post-accident testing. In the absence of such classifications, and without otherwise setting uniform and reasonably high threshold criteria for triggering events, the Navy's interest in determining whether drug use caused a certain event is thoroughly undermined.

For the foregoing reasons, the Court finds that the Navy has failed to demonstrate a nexus between post-accident drug testing of its employees as it is articulated in the Plan, and protection of public safety. Therefore the motion for preliminary injunction of the post-accident testing provisions of the Plan is GRANTED. The motion for summary judgment is DENIED.

### C. Reasonable Suspicion Testing Provisions

The Navy Plan permits drug testing upon reasonable suspicion of illegal drug use, as long as such suspicion is based on "specific objective facts and reasonable inferences drawn from these facts." OCPMINST 12792.3 at 23. Such facts are articulated under five criteria which are common in federal drug testing plans: (1) direct observation of drug use or possession and/or physical symptoms of being under the influence of a drug; (2) a pattern of abnormal conduct or aberrant behavior; (3) arrest or conviction for a drug-related offense, or identification of the employee as a focus of a criminal investigation into illegal drug possession, use or trafficking; (4) information provided either by reliable and credible sources or independently corroborated; (5) newly discovered evidence that the employee has tampered with a previous drug test; or (6) condition of a urine specimen which indicates probable adulteration, tampering or substitution. OCPMINST 12792.3 at 23–24.

Before conducting reasonable suspicion testing, the employee's supervisor must gather supporting information and obtain approval for testing from a supervisor at least one level further above. OCPMINST 12792.3 at 24. Follow-up documentation must also be prepared and submitted to the local drug program coordinator. *Id.*

■ Plaintiffs challenge the reasonable testing provisions largely because they are not limited to observations of on-duty conduct for the purpose of detecting on-duty impairment. The Court is of the opinion that this is not a fatal defect in the Plan. *See Connelly,* 753 F.Supp. at 297–99. Like other employers, the government has an interest in the efficiency and productivity of its employees, which constitutes a "special governmental need" as required by *Von Raab* and *Skinner.* Where drug testing serves such a special need, an employee's off-duty conduct may raise a sufficient risk of on-duty impairment to justify drug testing under the Fourth Amendment. *Accord, AFGE v. Cavazos,* 721 F.Supp. 1361, 1376–77 (D.D.C.1989); *Yeutter,* 733 F.Supp. at 414–16.

■ This is particularly true where the off-duty conduct is contemporaneous with the suspected drug user's employment. While it is true that the Navy's reasonable suspicion testing may be predicated in part, or even entirely, on off-duty behavior, each of the factors enumerated has a tendency to make the existence of on-duty impairment "more or less probable than it would be without the evidence." *Skinner,* 109 S.Ct. at 1421.

Nor is it fatally defective to the Plan that the criteria are not limited to evidence of current drug use, whether on or off duty. While the Court is of the opinion that evidence of long past drug use, with nothing more, would not provide a sufficient nexus with fears of current on-duty impairment to qualify as a "reasonable" suspicion, the failure to so limit the criteria on the face of the Plan does deprive the Plan of overall reasonableness. Should the Plan be applied in such a way as to rely on evidence too attenuated to create the required nexus with risk of on-duty impairment, a further

challenge will be ripe at that time. *E.g., McLeod v. Department of the Army,* 714 F.2d 918 (9th Cir.1983) (mere possession of marijuana found too attenuated a link to create nexus with on-duty impairment).

Further, the Supreme Court has not relied on distinctions between on-duty and off-duty drug use. In *Skinner,* post-accident testing of railroad workers could not conclusively establish whether the employee's use of drugs or alcohol contributed to the accident or merely impaired the employee while off-duty. The Court nevertheless upheld such testing. *Id.* 109 S.Ct. at 1420–21. Similarly, no distinction between on-duty and off-duty use was identified in *Von Raab.* The import of these decisions is that, as an employer, the government has a strong interest in its employees' off-duty drug use to the extent that such behavior increases the risk of on-duty drug impairment or otherwise detracts from job performance.

Finally, the requirement of individualized suspicion based on objective observable criteria naturally diminishes the privacy expectation of employees. Employees who use drugs while off-duty or who have a significant history of drug use are on notice that they are subject to reasonable suspicion testing. The Unions' argument that these employees are subject to more intrusive testing, through direct observation of urination, is unfounded. Under the Plan, reasonable suspicion of drug use may form a basis for direct observation, but direct observation is optional, not required, based on the site coordinator's judgment, which must be documented. Therefore, the Court finds that the provisions for reasonable suspicion testing do not on their face impermissibly intrude on reasonable privacy interests.

For these reasons, the motion for preliminary injunction is DENIED as to the reasonable suspicion testing provisions of the Plan, and summary judgment is GRANTED in favor of the defendants.

## IV. CIVIL SERVICE REFORM ACT

The Unions allege that, in addition to violating the Fourth Amendment, the Navy

drug testing plan violates the Civil Service Reform Act of 1978, which prohibits federal agencies from discriminating against employees on the basis of conduct which does not adversely affect job performance of that employee or others. 5 U.S.C. § 2302(b)(10). The Unions argue that use of verified positive drug test results as a basis for disciplinary action punishes employees for conduct not demonstrated to affect job performance, since no finding of on-duty impairment is required.

■ However this Court has acknowledged that the government as an employer has an interest in a drug-free workplace, based in reasonable interests in the efficiency and productivity of the workforce. The Unions argue that this creates a presumption of a nexus between drug use and impairment of departmental efficiency, which nexus held not to exist in *McLeod v. Department of the Army*, 714 F.2d 918 (9th Cir.1983). *McLeod* is inapposite, standing as it does for the proposition that illegal possession of drugs, without evidence of use, cannot supply a nexus to impairment of service efficiency. *Id.* at 920–21.

The entire purpose of the Navy Plan is to detect evidence of current ingestion of drugs, not mere possession. Thus the crucial connection missing in *McLeod* is necessarily present in disciplinary actions resulting from administration of the Plan. Further, any issues of denial of procedural due process raised under the Act have been answered by the District Court for the District of Columbia. *AFGE v. Cavazos*, 721 F.Supp. 1361, 1377; *Yeutter*, 733 F.Supp. at 418.

Therefore, partial summary judgment in favor of defendants is GRANTED as to plaintiffs' claims under the Civil Service Reform Act of 1978.

## V. CONCLUSION

For all of the foregoing reasons, the Court rules as follows:

1. The following provisions of the Navy drug testing plan are hereby ENJOINED during the pendency of this litigation:

(a) The Post–Accident or Unsafe Practices provisions of the Plan.

(b) Random testing of the following TDPs:

(i) Those identified as "Operation or Maintenance of Transportation or Major Mechanical or Electrical Equipment," OCPMINST 12792.3 at E–5, *with the exception of* motor vehicle operators, locomotive engineers, aircraft pilots, navigators and flight engineers, and boat operators;

(ii) Those identified in the "Public Health and Safety" category;

(iii) Those identified in the "National Security" category, *only* as to employees in those positions who do not hold top secret with access clearances;

(iv) Those identified as "Drug/Alcohol Rehabilitation Facility Positions; and

(v) Of those identified in "Protection of Life and Property" positions, only railroad dispatcher and aircraft attendant positions.

Defendants' motion for summary judgment is DENIED as to these Plan provisions.

2. Summary judgment for defendants is GRANTED as to the following provisions of the Plan:

(a) Automatic random drug testing designation for holders of top secret clearances with access;

(b) Random testing of the employees in the following positions;

(i) Law enforcement;

(ii) Firefighter positions;

(iii) Motor vehicle operator, locomotive engineer, aircraft pilot, navigator or flight engineer, and boat operator positions;

(c) Reasonable suspicion testing of Navy civilian employees.

Plaintiffs' motions for preliminary injunction are DENIED as to these Plan provisions.

3. The stay of testing issued December 29, 1989, is LIFTED, as to the following provisions of the Plan:

(a) Automatic random drug testing for holders of top secret clearances with access;

(b) Random drug testing for the other Automatic TDPs and for air traffic control positions, which were not challenged in this litigation;

(c) Random testing of the employees in the folllowing positions;

(i) Law enforcement;

(ii) Firefighter positions;

(iii) Motor vehicle operator, locomotive engineer, aircraft pilot, navigator or flight engineer, and boat operator positions;

(d) Reasonable suspicion testing of Navy civilian employees.

IT IS SO ORDERED.